## NEUBERTH *v.* LIZOTTE.

PATENTS; INTERFERENCE; SPECIFICATIONS AND CLAIMS; REDUCTION TO PRACTICE.

1. Where an applicant's invention is a machine for covering eyelets, a claim by him of a machine for covering studs or lacing hooks is improperly made, where he does not point out in his description any modification of the machine by which it could be made to cover studs or hooks, and any such modification would not be a matter of mere mechanical skill.

2. In an interference involving the invention of a machine for covering the heads of eyelets and lacing hooks with sheet celluloid, where the issue was as to whether the senior applicant was entitled to make the claims of the issue, and it appeared that a machine constructed and operated by him and relied upon by him as showing reduction to practice was not capable of operation in the manner intended by the claims of the issue, the decision of the Commissioner of Patents awarding priority to the junior party was affirmed.

No. 516. Patent Appeals. Submitted November 13, 1908. Decided January 5, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an interference proceeding having the following issue:

"1. In a machine for applying covering material to eyelets,

means for bending the covering material over the edge of the flange of an eyelet, combined with means for forcing said bent-over material under the edge of the flange.

"2. In a machine of the class described, means for bending covering material over the edge of the flange of an eyelet, and other means for thereafter forcing the covering material under the eyelet flange and into contact with the under surface of the flange.

"3. In a machine for covering eyelets with plastic sheet material, means for applying the material to the upper surface of the flange of an eyelet, and means for bending the material over the edge of the flange, combined with means for turning said bent-over material under the edge of the flange and into contact with the under surface of the flange.

"4. In a machine of the class described, means for bending covering material over the edge of the flange of an eyelet, and holding said covering material from reverse movement, combined with means for acting on the bent-over portion of covering material to force it under the flange.

"5. In a machine of the class described, means for bending covering material over the edge of the flange of an eyelet, combined with means for acting on the bent-over portion of covering material to force it under the flange and into contact with the under surface of the flange, said mechanism having provision for holding the covering material from lateral spreading while it is being forced under the flange.

"6. In a machine for covering eyelets with plastic sheet material, means for heating the plastic material, means for applying the material to the upper surface of the flange of an eyelet, and means for bending the material over the edge of the flange, combined with means for turning said bent-over material under the edge of the flange and into contact with the under surface of the flange.

"7. In a machine for covering studs, the combination with a die for shaping the covering material to conform to the outer surface of the stud, of means for acting on the projecting edge of the material to crimp and turn the same into contact with the

inner surface of the stud, and means for producing consecutive operations of the die, and the means for acting on the projecting edge of the material.

"8. In a machine for covering eyelets, the combination with means for shaping covering material to conform to the upper surface of the eyelet; of means for acting on the projecting edge of the covering material to crimp and turn the same under the edge of the flange of the eyelet."

Franklin G. Neuberth's application was filed April 28, 1904; Joseph Lizotte's, December 24, 1904.

Neuberth alleged conception in November, 1901, and reduction to practice in April, 1902. Lizotte claimed to have conceived the invention in 1891, to have made a model in 1892, and to have constructed a machine and reduced it to practice in May, 1901.

The invention of the issue is a machine for covering the heads of eyelets and lacing hooks with sheet celluloid. Neuberth's machine is designed particularly for covering eyelets, while that of Lizotte is specially adapted to covering hooks. It was not new to cover hooks and eyelets with celluloid. This had been done by heating a lump of celluloid to a point at which it would flow, and moulding it upon the flange of the eyelet or the head of the hook. Both of the applicants contemplated the use of sheet celluloid. A washer or disk is cut therefrom and heated to a temperature at which it will bend. It is then applied to one side of the hook or flange of the eyelet, over the edge of the same, and operated upon to securely fasten it to the article covered.

Three questions were raised for determination: 1. Whether Neuberth is entitled to make the claims of the issue.

2. Whether Lizotte actually reduced the invention to practice in May, 1901.

3. Whether if, having reduced his invention to practice as alleged, Lizotte lost the right to his invention through concealment and suppression of the same thereafter.

The Examiner of Interferences determined all of these questions in favor of Lizotte, and awarded priority to him. He

was reversed by the two members of the Board of Examiners-in-Chief then acting, who held that Neuberth had the right to make the claims, and, further, that Lizotte had not reduced to practice in 1901 as claimed.

On appeal to the Commissioner, this decision was reversed and priority awarded to Lizotte, both on the ground that Neuberth had no right to make the claims, and that Lizotte had completed his invention by reduction to practice in the summer of 1901 and before conception by Neuberth. From that decision Neuberth has appealed.

*Mr. Alfred H. Hildreth, Mr. Elmer P. Howe, Mr. Benjamin Phillips,* and *Mr. Horace Van Everen,* for the appellant.

*Mr. W. Orison Underwood* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The first question in order is Neuberth's right to make the several claims embodied in the issue.

The difficulty in determining the meaning to be given the claims is complicated by the several amendments of Neuberth's application before they were made. The testimony shows that, while both applications were depending, and before any interference had been declared, negotiations were had between the United Shoe Machine Company (the substantial owner of Neuberth's invention) and Lizotte, looking to the sale of his right to the said company. Lizotte had no knowledge of Neuberth's application, or of the construction of his machine. At the request of the company, he sent to it a copy of his application for the inspection of its counsel. The negotiations failed and the papers were returned. The amendments thereafter filed by Neuberth made changes in the statement of the operation of his machine in certain particulars, and revisers, among other things, the drawings of the original. Claims 1, 2, 3, 4, 5, 6, and 8 of the issue were then made for the first time. Those claims speci-

fy a machine for covering eyelets. Claim, or count 7 originated with Lizotte and specifies a machine for covering studs which is another name for lacing hooks. When this claim was suggested to Neuberth by the Examiner, he first filed a claim in which the word "eyelet" was substituted for "stud."

This claim 7 was first considered by the Commissioner. Neuberth's construction as described and illustrated could not be used to cover studs, or lacing hooks, and he so admitted when testifying as a witness in the case. He claimed, however, that a lacing hook could be made by first using his machine to cover the head of a properly shaped blank, and then forming the blank into a hook. He does not point out in his description any modification of his machine by which it could be made to cover hooks or studs; and, as was said by the Commissioner: "As such modification would not be a matter of mere mechanical skill, it must be held that Neuberth is not entitled to make a claim in the terms of count 7 of the issue."

It is sufficient now to say of the remaining counts of the issue that they involve devices for fastening the washer or disk of sheet celluloid to the top of an eyelet, bending it, and securing its edges to the other side of the eyelet flange, and thereby obtaining a complete covering of the same. On behalf of Lizotte, the contention is that the said claims, by their proper construction, specify means whereby the last step in the covering process is accomplished by bending over the part of the washer, which had previously been bent over the edge of the eyelet flange or other like article, and securing it to the under surface.

Neuberth disputes this limitation of the claims, and contends that they merely demand means for forcing the material, which had been bent at right angles to the flange, under the same, so as to secure a firm attachment. He argues that the novelty of the invention lies in the first step, which consists in bending the sheet celluloid down, and that it is sufficient that the bent-over portion be *forced* under the flange, thus securing the covering material to the eyelet. In his original application the machine is described as having means "provided for pressing a piece of covering material against the portion of the eyelet which

is to constitute the flange, and at the same time spreading or bending said portion whereby the flange is caused to cut into the covering material and imbed itself therein. The covering material may, and preferably will, be moulded into the desired form about the flange of the eyelet." He describes the operation of pressing the covering material against the flange of the eyelet and bending it at right angles to the flange, and says: "Thereafter, as the movable die completes its stroke, the pressure of the covering material against the partially out-turned flange of the eyelet and the wedging of the covering material between the enlarged portion 204 and the base of the eyelet flange bends or spreads said flange while at the same time the flange is caused to cut into the washer both by the direct pressure of the flange against the washer and by the spreading of the flange, which causes its edge portion to move radially outward and into the washer.

   *      *      *      *      *      *      *      *

"While the flange of the eyelet is being spread to cut into and imbed itself in the washer of covering material, the covering material is being pressed between the co-operating surfaces 194 and 202 of the two dies to mould it upon both sides of the flange of the eyelet."

In some of his original claims he includes the feature of spreading the flange and covering it to cut into, and become partially imbeded in, the washer or covering material.

An examination of Neuberth's evidence in both direct and cross-examination supports the following statement in the Commissioner's decision: "The description of the operation of the machine as given in the original specification agrees with the testimony of Neuberth, who states that the upper part of the washer does not go under the flange, but that the upper part of the celluloid is shifted upon itself so as to make it somewhat thicker on top, and the flange of eyelet spread so as to cut into the material."

Neuberth used celluloid thirty thousandths of an inch thick, and the cutting into this was about five-thousandths of an inch. No portion of the bent washer was turned or bent over under

the flange, and it seems that all of it that got under the flange is through the spreading of the flange and the cutting in and partial embedding referred to.   It appears from the testimony that several of Neuberth's machines were constructed and put in operation in the factory of the Brook company, to which the invention then belonged.   Several millions of eyelets were made and many of them shipped to shoe manufacturers.   It is claimed that no objection was made to the utility of these save in one instance, where a manufacturer complained that the covering would come off in fastening the eyelets in shoes.   In January, 1903, the manufacture was discontinued, and the machines were converted into use for striking out ordinary eyelets.   No good reason is given for suspending this manufacture if the eyelets so made were satisfactory in every respect.   A number of these eyelets were produced in evidence.

In the course of Neuberth's cross-examination, he said, upon examination of a cross section of the die, punch, and eyelet, that there had been a material change in the shape and thickness of the celluloid covering, and that the inner part or throat of the eyelet had been reduced very much; "in fact brought down to a sharp edge by the pressure, and the celluloid had shifted on itself and made it somewhat thicker on the top.   The exhibit also shows that the eyelet blank has slightly cut into the washer, as you can observe by comparing the washer and the celluloid side by side."   He was then shown an eyelet taken at random from the mass, and admitted that it showed that it has substantially preserved intact the striations produced in manufacture of the sheet celluloid upon the face of the eyelet.   He added: "It also proves, in my estimation, that the celluloid was not in proper condition of softness to be moulded; if it had been, these would have disappeared."   Another was then taken from the lot manufactured in 1902, and 1903, in which he said the surface striations could be seen upon the outer surface of the celluloid.

*X, 2, 163:* This shows, does it not, that the thickening on the face of the eyelet has taken place under the surface?

*A.* It does.   How far under the surface it would be impossible to say.

*X, 2, 164:* Then it shows, does it not, that there has been a molecular rearrangement?

*A.* Yes, there has been a rearrangement.

*X, 2, 167:* What you observe upon the face of the eyelet causing it to thicken without changing the striation marks shows an action in the nature of the former, does it not, at this point rather than in the direction of the latter?

*A.* The eyelet in question shows that there has been a rearrangement; it also shows that the fibers have been ruptured in this rearrangement, showing cleavage lines on the inner part of the fold of the eyelet, which are characteristic in almost all of our products.

*X, 2, 168:* In view of the examination which you have made of these eyelets, and the explanations which you have given, do you claim that the edge of the washer is turned under the edge of the flange?

*A.* Part of it, yes.

*X, 2, 169:* And, when you use the term "turned under" in your specification, it should be made to mean the action which takes place as you have testified in this examination?

*A.* Yes, I should think it would.

This turning under is first described in the amended specification.

In the operation of this machine the portion of the celluloid which is under the flange does not lie in a plane parallel to its original position, but in one at right angles thereto. The portion of the celluloid that has been bent over the edge of the flange is not further bent to bring it into contact with the under surface of the eyelet.

The claims under consideration were not made by Neuberth originally, but were filed with his amended specifications, and it is by the latter that their meaning must be determined.

In the amendment, whether the result or not of the examination of Lizotte's application, the mechanism is described as engaging the covering material and bending it over the edge of the flange, and comprising an "independent member for forcing or turning the bent-over covering material under the edge of the

flange and into contact with the under surface of the flange."
And this member as having "a face for engaging the bent-over
portion of the covering material and turning it under the flange
of the eyelet and into contact with the under surface thereof."
The amended sheet of drawings shows more plainly than the
original the successive steps of applying the washer to the eye-
let, bending it over the edge of the flange at right angles thereto,
and then further bending this bent-up portion under the under
surface of the flange and into contact therewith.

Lizotte's machine clearly shows means for pressing a thin
disk—much thinner than that made by Neuberth—against the
head of the lacing hook to shape the celluloid in conformation
with the outer surface of the hook. As the operation proceeds,
another piece of the mechanism bends the washer of celluloid
around the edge of the head of the hook. Certain independent
"wipers" bend over or turn and crimp the edge of the washer
under the edge of the flange of the hook, and, by another move-
ment of a die, the edges so bent or turned over are pressed down
and into firm contact with the under surface of the flange.

Considering the claims of the issue in the light of the specifi-
cations of Neuberth as amended, we think that they call for
substantially the same operation; that is to say, for two bends
of the covering material, the first bending the same at right
angles to the edge of the flange, and the second bending that
portion over under the flange for securing it thereto.

Inasmuch as the Neuberth machine, as constructed and oper-
ated, was not capable of the operation in the manner intended
by the claims of the issue, we must concur with the Commis-
sioner in the conclusion that he has no right to make them.

As this conclusion is sufficient for the determination of the
appeal, we deem it unnecessary to consume time with the con-
sideration of the question of Lizotte's reduction to practice.

For the reasons given, the decision will be affirmed. It is so
ordered, and that this decision be certified to the Commissioner
of Patents. *Affirmed.*